IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES | : |
| | : CRIMINAL NO. 07-717 |
| v. | : |
| DANIEL SIDDONS | : |

**Diamond, J.**                                      **December 10, 2009**

## MEMORANDUM

On March 3, 2009, Defendant Daniel Siddons pled guilty to numerous Counts of mail fraud, wire fraud, and bank fraud. (*Doc. No. 65.*) The charges stemmed from Defendant's schemes to misappropriate almost $1.6 million from investors – primarily senior citizens – and to secure bank loans and credit by dishonest means.

On July 15, 2009, Defendant filed a counseled "Motion to Withdraw Guilty Plea," alleging that: 1) he is innocent; and 2) his prior counsel was ineffective. (*Doc. No. 80.*) Having conducted an evidentiary hearing, I find that Defendant has not shown any entitlement to relief. Accordingly, I deny his Motion.

### I. Procedural History

On November 15, 2007, the grand jury charged Defendant with nine Counts of mail fraud, five Counts of wire fraud, one Count of bank fraud. 18 U.S.C. §§ 1341, 1343, 1344. On April 10, 2008, the grand jury returned a superseding indictment, charging Defendant with twenty-four Counts

1

of mail fraud, eight Counts of wire fraud, and one Count of bank fraud. (*Doc. No. 21.*) On October 9, 2008, the grand jury returned a second superseding indictment adding a Count of bank fraud. (*Doc. No. 33.*) Defendant was represented during this investigation by retained counsel, Gregory T. Magarity.

After several continuances, trial was to begin on November 12, 2008 – a year after the return of the original indictment. On November 5, 2008, Defendant sought another continuance to allow him more time to prepare his defense. (*Doc. No. 40.*) The Government vigorously objected, arguing that because many of its witnesses were elderly and seriously ill, additional delay would be prejudicial. (*Doc. No. 41.*) I overruled the Government's objection and granted Defendant's request. (*Doc. No. 43.*)

As I explain below, when Defendant said he could no longer afford counsel, Mr. Magarity agreed to continue representing him pursuant to Court appointment. On February 3, 2009, Defendant submitted a *pro se* letter in which he asked me to replace Mr. Magarity. I conducted a hearing on February 6, 2009, at which Defendant first demonstrated to me his extraordinarily tenuous relationship with the truth.

Defendant initially testified that he wanted a new lawyer because Mr. Magarity had said he would withdraw if Defendant did not plead guilty. See Hr'g Tr. 3-4, Feb. 6, 2009. When I credited Mr. Magarity's refutation of Defendant's version of events, Defendant immediately revised that version, this time testifying that Mr. Magarity had said "he had to consider withdrawing." *Id. at 5:16*. When I credited Mr. Magarity's refutation of this version of events, Defendant revised that version, this time agreeing with my observation that Mr. Magarity was "trying to do the best he can

for you." *Id. at 6:13-14*. A few moments later, however, Defendant revised that assessment, stating that he did not "think [Mr. Magarity] has my best interest at heart" because Mr. Magarity purportedly refused to prepare for trial and had not interviewed six potential witnesses. *Id. at 9:20*. Defendant, who is not a lawyer, said, "I don't want to try this case twice [because of] ineffective assistance of counsel." *Id. at 11:10-12*. Once again I discredited Defendant and credited Mr. Magarity's assurances that he would continue to represent Defendant zealously and that he would be prepared to go to trial. I again told Defendant, "I believe Mr. Magarity is doing the best he can for you." *Id. at 11:24-25*. Remarkably, Defendant responded, "I know he is." *Id. at 12:1*. I subsequently found that "Defendant's . . . complaints about his counsel were simply an attempt to manipulate the Court and the system, a dishonest attempt at that." *Hr'g Tr. 76:18-21, March 3, 2009.*

Having discredited Defendant's criticisms of counsel, I ruled that he had not presented a valid reason to replace Mr. Magarity. *See Hr'g Tr. 12, Feb. 6, 2009*; Fischetti v. Johnson, 384 F.3d 140, 145 (3d Cir. 2004) ("A defendant's right to counsel is not without limit and cannot be the justification for inordinate delay or manipulation."); United States v. McFadden, 630 F.2d 963, 972 (3d Cir. 1980) ("[T]he trial court has considerable discretion in refusing to delay the trial in order to secure substitute counsel even though there is some indication of a defendant's dissatisfaction with his initial counsel.") (internal quotation marks omitted).

Trial was ultimately set to begin on March 10, 2009. On February 27, 2009, Defendant decided to plead guilty. On March 3, 2009, I attempted to conduct a guilty plea colloquy with Defendant. Early in the colloquy, however, Defendant again sought to raise the same complaints about Mr. Magarity that I had discredited during the February 6th hearing. I told Defendant that I could not in these circumstances accept his guilty plea, and that the matter would proceed to trial.

3

*See* Hr'g Tr. 6:7-10, March 3, 2009. Accordingly, I ended the colloquy and immediately began a hearing on pre-trial motions. At the hearing's conclusion, Defendant stated that he now wanted to plead guilty to one of the charges. *Id. at 40:13-16*. I advised Defendant that "[p]leading guilty is a very serious thing," and that I could not accept his plea as "knowing, voluntary, and intelligent" as long as he continued to fabricate criticisms of Mr. Magarity. *Id. at 41:14-18*. I ordered a recess to allow Defendant to confer with counsel.

After meeting with his lawyers for almost an hour, Defendant again stated that he wanted to plead guilty to all charges. When Defendant was again sworn, I told him that "in light of the difficulties that we've had, it is especially important that you understand that you are under oath . . . [a]nd that you give me truthful answers, whatever those answers might be." *Id. at 42:19-24*. I explained that Defendant had "an absolute right to go to trial" and that "you don't have to plead guilty." *Id. at 42:2-8*. Defendant stated that he understood. I then conducted a lengthy plea colloquy, during which I again asked Defendant if he was satisfied with counsel:

> THE COURT: And are you satisfied with Mr. Magarity's representation of you?
> THE DEFENDANT: I am, sir, yes.
> THE COURT: Are you certain of that?
> THE DEFENDANT: I am, sir, yes.
> THE COURT: You've had a chance to think about it. You're satisfied with Mr. Magarity – I want to be absolutely clear about this. You're stating under oath that you are satisfied with Mr. Magarity's representation of you, correct?
> THE DEFENDANT: Unequivocally so, yes, sir.

*Id. at 46:12-21*.

During the colloquy, the prosecutor presented an extensive description of the plea's factual

basis, setting out Count by Count Defendant's wrongful actions and the supporting evidence the Government was prepared to present at trial. Defendant admitted to those wrongful actions and repeatedly stated that he was "freely and voluntarily pleading guilty" to the crimes charged because he was guilty. *Id. at 62-63.* After questioning Defendant closely in accordance with Federal Rule of Criminal Procedure 11, I accepted his guilty plea because I was convinced that Defendant had decided to end his manipulative efforts and acknowledge his guilt. Accordingly, I found, *inter alia*, that "Defendant is pleading guilty with his eyes fully open and [that] he knows exactly what he is doing as advised by counsel and the Court and the Government." *Id. at 76:22-25*.

On June 2, 2009, the Probation Office issued its Presentence Investigation Report, calculating Defendant's Guidelines range at 78 to 97 months imprisonment. PSR, ¶ 127. On July 15, 2009, Defendant, having retained new counsel, filed the instant Motion to withdraw his plea. (*Doc. No. 80.*) Defendant argues that he is innocent, and again makes the criticisms of Mr. Magarity that I discredited on February 6th (and that he "unequivocally" withdrew on March 3rd). Significantly, nowhere in his Motion does Defendant allege that counsel's purported ineffectiveness caused Defendant to plead guilty.

## II. Findings of Fact

On October 23, 2009, I held a hearing on Defendant's Motion. Defendant and his father testified, as did Mr. Magarity and his former associate, Mark Drasnin. I largely discredit the testimony of both Defendant and his father. I credit the testimony of Messrs. Magarity and Drasnin, who convincingly explained their efforts on behalf of Defendant, as well as the difficulties they

faced. In accordance with Rule 12(d), I make the following factual findings. See Fed. R. Crim. P. 12(d).

**A. The Investigation and Indictments**

The grand jury initially investigated Defendant in connection with allegations that he had abused his position as a loan advisor at Wachovia Bank and First Union Securities, Inc. In late 2006, Defendant retained Mr. Magarity to represent him in connection with a grand jury subpoena *duces tecum* he had received. See *Hr'g Tr. 105-106, Oct. 23, 2009*. A former First Assistant and Frauds Division Chief in the U.S. Attorney's Office for this District, Mr. Magarity has been a lawyer for almost forty years and is among the area's leading criminal defense attorneys. *Id. at 34*.

Defendant subsequently received a target letter and was indicted in November 2007. (*Doc. No. 1.*) Defendant stated that he could not afford to retain Mr. Magarity for trial. After his arrest, Defendant and his father implored Mr. Magarity to continue his representation through Court appointment. *Hr'g Tr. 38, Oct. 23, 2009.* Mr. Magarity accompanied Defendant to his arraignment, where the Magistrate Judge also asked Mr. Magarity if, given this matter's complexity, he would continue his representation by appointment. *Id.*; (*Doc. Nos. 10-11.*) Although he is not a member of this Court's Criminal Justice Act Panel, Mr. Magarity laudably agreed to accept the appointment. (*Doc. Nos. 10-11*); *Guidelines for the Administration of the Criminal Justice Act and Related Statutes, Part A, 2.01,* available at www.uscourts.gov/defenderservices/Chapter_2.cfm#A ("However, when the district judge . . . determines that the appointment of an attorney, who is not a member of the CJA panel, is in the interest of justice, judicial economy or continuity of representation . . . the attorney may be admitted to the CJA panel *pro hac vice* and appointed to

6

represent the CJA defendant.").

The grand jury ultimately charged that from 2002 through 2008, Defendant: 1) defrauded some sixteen individuals who had sought to invest in his companies (Counts 1-24: Mail Fraud, Counts 25-32: Wire Fraud); 2) defrauded InterSTATE Net Bank (Count 33: Bank Fraud); and 3) defrauded Wachovia Bank (Count 34: Bank Fraud). (*Doc. No. 33*.)

**B. The Government's Allegations and Defense Efforts**

Throughout his representation of Defendant, Mr. Magarity was assisted by Mr. Drasnin. They, in turn, were assisted by Robert Brennan, a former federal agent whom Mr. Magarity employed as a private investigator. Messrs. Magarity and Drasnin immediately began working Defendant's case. *See Hr'g Tr. 39-40, Oct. 23, 2009*. They met repeatedly with the Government, and reviewed some 46,000 pages of documents provided in discovery. *Id. at 41, 110*. They met with Defendant thirty to forty times and spoke with him by telephone continually. *Id. at 57, 115-16*.

Most of the charges against Defendant stem from his efforts to obtain funding for illusive investments. The most significant of these projects was the Bayshore Inn, a retirement community in Egg Harbor, New Jersey. Critical to Defendant's scheme was securing a $1.8 million Small Business Administration loan. He intended to use this loan to re-pay his investors. *Id. at 45-46*; (*Doc. No. 33*.) After the SBA denied the loan – thus making the project unfeasible – Defendant continued to solicit individuals, assuring them that their investments in Bayshore were safe and guaranteed. In fact, Bayshore had become a "Ponzi scheme": Defendant spent money he received from his investors on himself and to re-pay other investors. (*Doc. No. 33*); Cunningham v. Brown, 265 U.S. 1 (U.S. 1924). Although Defendant began civil litigation in New Jersey to reverse the

7

SBA's decision, he had no success. At least one of Defendant's victims initiated a civil suit against him. (*Doc. No. 52, at 4*.)

When Defendant needed more money, he sought out additional investors, providing them with Disclosure Statements and Promissory Notes. The Statements and Notes provided that although the Bayshore investment was not "bank-backed," it paid a higher interest rate than other investments available to his victims. Defendant did not otherwise explain to his victims the terms of these documents, through which he "attempted to eliminate any personal liability [that might otherwise have attached to Defendant]." *Hr'g Tr. 52: 6-9, March 3, 2009*.

Defendant sought to assist his lawyers in defending against these allegations. He suggested to counsel the names of witnesses he thought might be helpful. Although Defendant testified that he suggested some 57 witnesses, this is untrue; during the October 23rd hearing, he could name only six. *See Hr'g Tr. 14-17, Oct. 23, 2009*. Mr. Magarity – who visited the Egg Harbor site with Defendant – met with four of the six (Messrs. Vasello, Kepner, Reisen, and Green). *Id. at 46-47*. He also reviewed the depositions they had given in the related civil litigation. *Id. at 43*. After speaking with these men more than once, Mr. Magarity determined that whatever their connection to the civil litigation, they could not offer any relevant, helpful testimony in Defendant's criminal trial. *Id. at 48-51*.

Mr. Magarity considered the potential testimony of all witnesses Defendant suggested. *Id. at 48-49*. If, based on Defendant's description or the witness' deposition testimony, Mr. Magarity believed a witness might be helpful, either he or Mr. Brennan interviewed the witness. *Id. at 50-55*. If it was apparent that the witness could not help the defense (as was the case with two of the six

8

witnesses Defendant named at the October 23rd hearing), they were not interviewed. *Id. at 50*. Unfortunately for Defendant, none of the witnesses he suggested could offer testimony helpful to his criminal defense. *Id.* Moreover, some of the witnesses Defendant suggested – his brother, for instance – refused even to speak with the defense. *Id. at 51:8-10*.

Mr. Magarity did not limit his investigation to the witnesses Defendant suggested. *Id. at 51:11-14*. On the contrary, the defense team interviewed many others, including some of Defendant's victims, representatives of the SBA's Office of Inspector General, and members of the National Association of Securities Dealers. *Id. at 54-56*. Both Messrs. Magarity and Drasnin concluded, however, after reviewing the voluminous criminal discovery and the civil litigation materials, conducting numerous interviews, otherwise investigating this matter, and repeatedly consulting with their client, that Defendant had no viable defense to the bulk of the charges. *Id. at 65-66, 71, 137, 144*. Mr. Magarity was especially concerned with the charges relating to Defendant's continued solicitation of private investments for the Bayshore Inn after the SBA loan was denied. *Id. at 65*.

Counsel discussed their concerns with Defendant, who authorized them to begin plea negotiations with the Government. *Id. at 149, 156-57*. Defendant instructed counsel first to learn the Government's "best offer." *Id. at 149:22*. Not surprisingly, given the imperatives of plea negotiation, the Government was not willing to begin in the manner Defendant wished. *Id. at 114-118, 149-150*. Accordingly, the Parties engaged in extended plea discussions, throughout which counsel kept Defendant informed. *Id. at 115-116*.

The Government indicated that if Defendant were convicted after trial, it would likely seek

9

an enhanced sentence to reflect the harm Defendant had caused to his elderly victims, some of whom suffered from dementia. *Id. at 119.* Counsel was concerned that the Government might well be entitled to this enhancement, which could result in an increased term of incarceration. See U.S.S.G. § 3A1.1 (enhancement for vulnerable victims). As originally anticipated by the Parties, however, the Government would make sentencing concessions as part of a plea agreement. *Hr'g Tr. 64-68, 119-120, Oct. 23, 2009*.

Mr. Drasnin drafted a memorandum setting forth the potential penalties Defendant faced with and without a plea agreement. *Id. at 114, 122-25.* The memorandum provided a framework for the frequent discussions during which Defendant and his lawyers considered the advantages and disadvantages of pleading guilty. *Id. at 60, 126:19-25.* In light of the strength of the Government's case, counsel strongly recommended that Defendant enter into a plea agreement that would afford him some benefit. *Id. at 65, 137:9-10.* They never insisted that he do so, however. *Id. at 137:7-10.* On the contrary, as Mr. Magarity explained:

> It's very simple, the client always makes the decision as to whether to go to trial or whether to plead. My job is to explain the evidence, what's likely to happen, what the potential consequences are to him and his life and his future, and to make recommendations. But . . . if he said. . . I definitely want to go to trial, after he heard all of the options and the potential consequences, that's his decision and then we would go to trial.

*Id. at 58:9-17.*

For months Defendant could not decide whether to plead guilty. Accordingly, his lawyers continued to prepare for trial – interviewing potential witnesses, anticipating the witnesses the Government was likely to call and possible lines of cross-examination, and formulating possible defenses. *Id. at 60-61, 127-128.* The Government's direct case was expected to take at least four

weeks to present. *Id. at 69:23*. Accordingly, when Defendant finally decided to plead guilty – on February 27, 2009, some two weeks before jury selection was to begin – the defense had not yet finalized a list of witnesses, nor had it issued trial subpoenas (in the unlikely event that any witness helpful to the defense would have required a subpoena). Counsel intended to finalize the defense as they heard and evaluated the Government's trial presentation. *Id. at 127-128*. In addition, as trial neared, defense counsel prepared and submitted voir dire questions, jury interrogatories, verdict sheets, jury instructions, and responses to the Government's Motions *in limine*. (*Docs. No. 61*, *64*.) Because counsel apprised Defendant of their efforts, he understood that his lawyers were prepared to try his case.

Unfortunately for Defendant, as he equivocated, the Government – which also continued to prepare for trial – offered him fewer and fewer concessions in return for his guilty plea. *Id. at 118:4-15*. Accordingly, by the time he made his decision on February 27th, the only concession the Government would offer was a stipulation that Defendant receive a three point downward Guidelines adjustment for acceptance of responsibility. *Id.*; U.S.S.G § 3E1.1. Defendant thus pled guilty without any written agreement. *Hr'g Tr. 117:14-16, Oct. 23, 2009*. Rather, during the plea colloquy, the prosecutor stated – and Defendant acknowledged – that this stipulation was the sole consideration offered by the Government in return for the plea. *Hr'g Tr. 47-48, March 3, 2009*.

Counsel intended at sentencing to argue, *inter alia*, that: 1) the constitutional prohibition against *ex post facto* punishment barred the application of certain Guidelines provisions; and 2) the Government sought to overstate Defendant's criminal history. *Hr'g Tr. 123-24, Oct 23, 2009*. Counsel believed that these contentions along with the three point reduction could considerably reduce Defendant's Guidelines range. *Id. at 123-26*.

11

**C. Defendant's Decision to Plead Guilty**

During the week of February 23, 2009, counsel's trial preparation intensified. Id. at 63,129. I had scheduled a hearing for Friday, February 27, 2009 to consider the Government's Motion to Revoke Defendant's Bail. (*Doc. No. 52*.) Defendant and his father did not receive word that I had continued the hearing. Accordingly, on the 27th they arrived at the courthouse, where they met with Messrs. Magarity and Drasnin. The four went to Mr. Magarity's office and discussed the bail question and the possibility of a guilty plea. See Hr'g Tr. 82-83, 136, 151, Oct. 23, 2009. As Mr. Drasnin testified:

> [W]e told Dan [Siddons] that . . . it was likely that he would lose the bail issue or that if he did lose the bail issue that he was going to be remanded into custody . . . because there couldn't be any conditions that would be allowed to keep him out. We had been in discussions with the plea for this whole time and had told him for the past couple weeks we kept telling him that you've got to make a decision. Either decision is fine but you've got to make a decision.

Id. at 136:12-20. At that meeting, Defendant finally told his lawyers that he would plead guilty in return for the three point stipulation. Counsel informed the prosecutors, who filed a guilty plea memorandum that same day. Id. at 135-36.

I had intended to conduct Defendant's guilty plea hearing on Monday, March 2nd, but the courthouse was closed because of inclement weather. I rescheduled the hearing to March 3rd. Before the hearing, I provided the Parties with a copy of the colloquy I intended to conduct. See Fed. R. Crim. P. 11. Counsel reviewed the colloquy privately with Defendant before the hearing began. Defendant again told his lawyers that he wanted to plead guilty. Hr'g Tr. 138:12-16, Oct. 23, 2009.

As I have described, I ended the guilty plea colloquy when Defendant again sought to make

12

complaints about Mr. Magarity that I had repeatedly discredited during the February 6th hearing. I then conducted a hearing on the Government's Motion to Revoke Defendant's Bail. (*Doc. No. 52*.) As a condition of Defendant's pretrial release, the Magistrate Judge had explicitly forbidden Defendant from directly contacting his victims. (*Doc. No. 6*.) The Government demonstrated that Defendant had repeatedly violated this Order, attempting to bribe his victims with money and gifts. (*Docs. No. 52, 68*.) I revoked Defendant's bail and then heard argument on the Government's motions *in limine*.

As I concluded the March 3rd hearing, Defendant announced that he would plead guilty to one of the charges. See *Hr'g Tr. 40:13-16, March 3, 2009*. I recessed the proceedings and allowed him to consult with his lawyers. *Id. at 40-42*. Counsel discussed with Defendant and his family the choices he now faced. See *Hr'g Tr. 141, Oct. 23, 2009*. Counsel advised Defendant that he would gain no advantage if he pled guilty to only one of the charges. *Id. at 62, 142*. Counsel were also concerned that in light of Defendant's behavior, the Government would no longer stipulate to a three point downward adjustment (assuming I would even accept Defendant's guilty plea). *Id. at 141-142*.

After determining that the Government still offered the stipulation, counsel

> again went through the written plea colloquy with [Defendant], told him that these are the questions that would be asked and if there is – if you have an issue tell us now because we don't want to do – do this again and we'll go to trial. But he had to, if he wanted to plea then he – it was time. There was no – there was no turning back. This was probably the last time to plea and get any kind of consideration for the plea and if he was going to do it, it had to be then.

*Id. at 142:15-23*. Defendant told his lawyers that he would plead guilty to all charges. As I have described, after he returned to the courtroom, Defendant "unequivocally" expressed his satisfaction with his lawyers and pled guilty. *Hr'g Tr. 46:21, March 3, 2009*.

13

For months, Defendant has sought dishonestly to manipulate these proceedings to his advantage. Indeed, during the February 6th hearing, Defendant announced the strategy he intended to employ. *See* Hr'g Tr. 11:12, Feb. 6, 2009 ("I don't want to try this case twice [because of] ineffective assistance of counsel.") I discredit Defendant's testimony that he is innocent and that he pled guilty involuntarily. On the contrary, the credible evidence establishes that Defendant chose to plead guilty because he knew he was guilty, he knew that the Government's evidence was overwhelming, and he understood that it was in his best interest to plead.

On June 2, 2009, Defendant learned that his Guidelines range was 78 to 97 months imprisonment. PSR, ¶ 127. He then sought to withdraw his guilty plea because he wanted to avoid this potential sentence and because he knew that the resulting delay would prejudice the Government.

**III. Conclusions of Law**

A guilty plea is a "solemn act." Brady v. United States, 397 U.S. 742, 748 (U.S. 1970). Accordingly, a defendant may not withdraw his guilty plea for any reason. See United States v. Brown, 250 F.3d 811, 815 (3d Cir. 2001); United States v. Martinez, 785 F.2d 111, 114 (3d Cir. 1986). Rather, he "may withdraw a plea of guilty or nolo contendere . . . after the court accepts the plea, but before it imposes sentence if . . . the defendant can show a fair and just reason for requesting the withdrawal." Fed. R. Crim. P. 11(d)(2). In determining whether a defendant seeking to withdraw has made this showing, the district court must consider: "(1) whether the defendant asserts his innocence; (2) the strength of the defendant's reasons for withdrawing the plea; and (3)

whether the government would be prejudiced by the withdrawal." United States v. Jones, 336 F.3d 245, 252 (3d Cir. 2003). The Jones Court further cautioned:

> The burden of demonstrating a 'fair and just' reason falls on the defendant, and that burden is substantial. A shift in defense tactics, a change of mind, or the fear of punishment are not adequate reasons to impose on the government the expense, difficulty, and risk of trying a defendant who has already acknowledged his guilt by pleading guilty.

Id. (internal citations and quotation marks omitted).

### A. Defendant Has Not Adequately Asserted His Innocence

When he pled guilty, Defendant admitted to the following facts: In obtaining a $928,000 loan from InterSTATE Net Bank, Defendant knowingly made materially false statements on a personal financial statement that he provided to the Bank. Defendant fraudulently induced Wachovia Bank to increase his available credit by making credit card payments to the Bank through a checking account that he knew was without sufficient funds to cover the payments. Defendant also defrauded some sixteen people of almost $1.6 million. Most of Defendant's victims were vulnerable and elderly. These victims – some of whom had given Defendant their life savings – believed they had made legitimate investments in his companies, MFD Property Holdings, Bayshore Inc., and Bayshore Holdings, LLC. Although the "Ponzi scheme" Defendant had devised was not a legitimate investment, he told his victims that "their investment was no risk and that their principal was guaranteed." *Hr'g Tr. 51:21-23, March 3, 2009*. Defendant, who, as a financial advisor at Wachovia Bank and First Union Securities, had helped many of his victims establish retirement plans, "caused many of these elderly investors through misrepresentations [that they would receive higher returns] to cash out their retirement annuities." *Id. at 51:16-18.* Defendant sent his victims fraudulent

15

monthly statements showing their investments were growing, when in fact Defendant had already spent their money to pay off other investors and loans and to pay for his own personal extravagances, including Mercedes Benz and Hummer automobiles and expensive jewelry. *Id. at 52*. Defendant continued to solicit investors and provide them with fraudulent statements even after the SBA denied the Bayshore loan. He continued to assure his victims that he would repay them well after he knew that he would never be able to do so.

In claiming that he is innocent, Defendant presents evidence that refutes virtually none of these admissions. Instead, he relies on the Disclosure Statements and Promissory Notes I described earlier. Defendant states (incorrectly) that "the crux of the Government's allegations is that Mr. Siddons led people to believe that Bayshore Inn, Inc. was a bank-backed product." (*Doc. No. 80, at 4*.) He observes that the Disclosure Statements – which only five investors signed – provide that the investments are not FDIC-insured or guaranteed by any bank, and that the Promissory Notes do "not limit the way Bayshore could use the money." (*Doc. No. 80, at 4*.) Finally, Defendant observes that the Promissory Notes "did not include false statements." *Id.*

These documents hardly establish Defendant's innocence. The Statements and Notes have nothing to do with Defendant's admissions of bank fraud, nor do they relate to Defendant's admission that he ran a "Ponzi scheme." The Notes do not somehow nullify the phony monthly statements Defendant admitted sending to his victims. Nor do the documents contradict Defendant's admission that he falsely told his victims that their investments were risk-free and guaranteed. The documents do not contradict Defendant's admission that he urged his victims to sign the Promissory Notes without first explaining their terms.

From the mass of evidence in this case, Defendant has culled several documents that he believes – viewed in isolation from his admissions and tens of thousands of other relevant documents – are exculpatory. However useful Defendant thinks these documents might have been at trial, they certainly do not establish his innocence. On the contrary, the Government intended to use at least some of the Statements and Notes as additional proof that Defendant sought to mislead his victims. *See Hr'g Tr. 52, March 3, 2009*. Indeed, Defendant submitted a number of the Statements and Notes to his victims *after* the SBA denied the Bayshore loan. (*Doc. No. 80, at Ex. C.*)

Having prepared the Statements and Notes, Defendant was obviously aware of their existence when he pled guilty. They do not warrant my allowing Defendant to withdraw his guilty plea. As the Jones Court advised:

> Bald assertions of innocence are insufficient to permit a defendant to withdraw his guilty plea. Assertions of innocence must be buttressed by facts in the record that support a claimed defense. [The defendant must] give sufficient reasons to explain why contradictory positions were taken before the district court and why permission should be given to withdraw the guilty plea and reclaim the right to trial.

United States v. Jones, 336 F.3d at 252 (internal citations and quotation marks omitted).

Defendant has not buttressed his claim of innocence. Moreover, Defendant has not credibly or sufficiently explained why he admitted to the Government's myriad factual allegations and now takes contradictory positions. See United States v. Sacksith, 248 Fed. Appx. 430, 435 (3d Cir. 2007) ("[A] defendant seeking to withdraw a guilty plea must, in addition to reasserting his innocence, give sufficient reasons to explain why contradictory positions were taken before the district court.") (internal citations and quotation marks omitted). In these circumstances, Defendant has not adequately asserted his innocence.

17

**B. The Strength of Defendant's Reasons for Withdrawing his Guilty Plea**

Defendant's entire discussion of this Jones factor in his Motion is as follows: "Mr. Siddons repeatedly expressed dissatisfaction with Mr. Magarity's representation." (*Doc. No. 80, at 4*.)

Nowhere in his Motion does Defendant allege that counsel's purported ineffectiveness compelled Defendant to plead guilty. The absence of this allegation itself warrants a denial of Defendant's Motion. See Hill v. Lockhart, 474 U.S. 52, 57-59 (1985); United States v. Nahodil, 36 F.3d 323, 326 (3d Cir. 1994); United States v. Warren, 86 Fed. Appx. 974, 976 (7th Cir. 2004). I will nonetheless construe Defendant's Motion as including an allegation that but for his counsel's ineffectiveness, he would not have pled guilty. Defendant still is not entitled to relief, however.

First, as I have found, Defendant knew his lawyers were prepared for trial; he pled guilty because he also knew both that he was guilty and that it was in his best interest to plead.

In any event, it is obvious that Messrs. Magarity and Drasnin were competent. To make out ineffective assistance of counsel in the instant context, Defendant must show (1) "that his attorney's advice was under all the circumstances unreasonable under prevailing professional norms"; and (2) but for counsel's errors the defendant would not have pled guilty and would have chosen to go to trial. United States v. Day, 969 F.2d 39, 42 (3d Cir. 1992) (citing Strickland v. Washington, 466 U.S. 668, 687-91 (1984)); see also Hill v. Lockhart, 474 U.S. at 57-59; United States v. Nahodil, 36 F.3d at 326; United States v. Warren, 86 Fed. Appx. 974, 976 (7th Cir. 2004).

The work Mr. Magarity and Mr. Drasnin did on Defendant's behalf was excellent. As I have found, they mastered the voluminous discovery in this complex matter, interviewed and investigated potentially helpful witnesses and defenses, and kept their client informed throughout. They

understood the strength of the Government's case and the lengthy sentence Defendant could receive if he were convicted. They acted reasonably in apprising Defendant of their concerns and advising him to plead guilty in return for sentencing concessions by the Government. See United States v. Cronic, 466 U.S. 648, 657 (U.S. 1984) ("[E]ven when there is a bona fide defense, counsel may still advise his client to plead guilty if that advice falls within the range of reasonable competence under the circumstances."). Had Defendant followed counsel's advice sooner, he would have obtained greater concessions.

In these circumstances, because Defendant has utterly failed to show that his lawyers' performance was "unreasonable under prevailing norms," he has not offered an adequate reason for seeking to withdraw his plea. Day, 969 F.2d at 42.

### C. Prejudice to the Government

The Government need not show prejudice unless Defendant has made out the first two Jones factors. See Jones, 336 F.3d at 255. Defendant has not met that burden. It is nonetheless plain that allowing Defendant to withdraw his guilty plea would prejudice the prosecution.

Defendant targeted primarily the elderly. Indeed, of the sixteen individual victims, four have already passed away, a fifth is entering end of life care, and a sixth has entered an assisted living facility. (*Doc. No. 100*.) The prosecution thus argues convincingly that the delays that would result from permitting Defendant to withdraw his plea "create the very real risk that government witnesses will not be available to testify either because of illness or death." (*Doc. No. 81, at 12*.) In these circumstances, the Government would be prejudiced if I allowed Defendant to withdraw his guilty plea. See United States v. Lamb, 1996 U.S. App. LEXIS 29701 (6th Cir. Nov. 13, 1996); United

19

States v. Sanchez, 1993 U.S. Dist. LEXIS 5736 (E.D. Pa. May 3, 1993).

### III. Ruling

Defendant has not presented any "fair and just" reason for seeking to withdraw his guilty plea. Fed. R. Crim. P. 11(d)(2). On the contrary, it is apparent that "the fear of punishment" and a desire to prejudice the Government motivate Defendant. Jones, 336 F.3d at 252. In these circumstances, Defendant is not entitled to any relief.

An appropriate Order follows.

BY THE COURT.

*/s Paul S. Diamond*

_____

Paul S. Diamond, J.